IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON MANALANSAN, et al.,    :
    Plaintiffs    :
        :
        :
    v.    :    Civil No. AMD 01-312
        :
BOARD OF EDUCATION    :
OF BALTIMORE CITY, et al.,    :
    Defendants    :

...o0o...

MEMORANDUM

I.    Introduction

This action was brought by Karen Swaggerty in her own right and on behalf of her

son, Brandon Manalansan, pursuant to the Individuals with Disabilities Education Act

("IDEA" or "the Act"), 20 U.S.C. §§ 1400, *et seq.*, the Rehabilitation Act, 29 U.S.C. § 794,

42 U.S.C. § 1983, and state law, against defendants, the Maryland State Department of

Education and its Superintendent, Nancy S. Grasmick, (together, "MSDE") and the Board

of Education of Baltimore City and its Superintendent, Carmen V. Russo (together,

"BCPS").[1] Plaintiffs allege that defendants failed to provide Brandon with a "free

appropriate public education" ("FAPE") as required by IDEA, 20 U.S.C. § 1400 (d)(1)(A),

for the 1999-2000 school year, in that they failed to implement his Individualized Education

---

[1] The complaint includes four counts, each of which alleges a violation of plaintiffs' rights under "the IDEA, §504[of the Rehabilitation Act], and Maryland law." Specifically, Count I alleges that defendants failed to implement Brandon's IEP, which included the provision of an adult aide. Count II alleges the administrative law judge improperly failed to find that Brandon was denied a FAPE. Count III alleges that defendants effected an improper change in placement. Count IV alleges the administrative law judge improperly failed to find that defendants effected an improper change in placement. Relief will be granted as to Count I only, and the other counts dismissed.

Plan ("IEP"). Plaintiffs also allege that Brandon's transfer to a new school constituted an improper change in educational placement under 20 U.S.C. § 1415. Plaintiffs seek injunctive and declaratory relief.

BCPS filed a motion to dismiss for failure to state a claim and MSDE filed a motion to dismiss, or in the alternative, for summary judgment.[2] A hearing was held on these motions on June 25, 2001. Counsel for the parties agreed that the record is complete and my review of all claims should be based on the administrative record compiled below. For the reasons set forth herein, I shall reject the determination of the administrative law judge and order Brandon returned to his original elementary school as a measured remedial response to the violation established in the record.

II.    Analysis

    A.    Background

Brandon Manalansan is a seven year old who has cerebral palsy, hydrocephalus, and a seizure disorder. These conditions have caused Brandon to suffer mobility, motor, and attentional impairments. He has a hard time balancing and using his left side; his balance

---

[2]Inexplicably, BCPS argued that plaintiffs failed to state a claim because their allegations concerned "educational malpractice," a claim which is not cognizable under Maryland law. *See Hunter v. Bd. of Educ.*, 439 A.2d 582 (Md. 1982). While the complaint's discussion of the injury Brandon suffered when he was not supervised may be suggestive of a claim for negligence, manifestly, this case does not present a damages claim for malpractice or negligence. Rather, it is plain that the central issue is whether Brandon's IEP, which mandated various levels of assistance and supervision, was implemented at Thomas Johnson Elementary School, his new school after he was transferred from Francis Scott Key Elementary School. The accidental fall is simply an illustration that the IEP was not implemented, in that the required aide was not with him at the time of the incident, as well as on many other occasions.

problems make him more susceptible to falling because he is unable to recover his balance easily when he is jostled. Brandon has a short attention span. He has a ventriculoperitoneal shunt that extends from the back of his head and is drained into his abdomen. Brandon has been qualified for special education services under the disability category of "other health impairment." His IEPs make clear that his disabilities affect his balance, mobility, and motor skills as well as cognitive and attention abilities.

For the school years 1997-98 and 1998-99, Brandon attended Francis Scott Key Elementary School ("FSK") for pre-kindergarten and kindergarten. FSK is not Brandon's zone school, but is located near his home. In addition, Brandon's aunt lives across the street from FSK; thus, a relative could be easily contacted and summoned to school in the case of a medical emergency such as a seizure. FSK is a one-floor building; there are no stairs in the interior or exterior of the school. These physical aspects of the school made it more accessible to Brandon and easier for him to negotiate the environment with less assistance than when stairs and other obstacles are involved. TJ has stairs both inside and outside the school building.

Brandon attended pre-kindergarten and kindergarten classes and received special education services at FSK. Special education services were enumerated in his IEP. The IEP was modified in the 1998-99 school year to provide for the assistance of an aide to supervise Brandon. At FSK the same aide consistently assisted Brandon. The aide's attendance was good.

In June 1999, Swaggerty received a letter that Brandon was being transferred to his zone school, Thomas Johnson Elementary ("TJ"), because FSK was overcrowded. Specifically, the notice of transfer from FSK principal Paul Llufrio stated that "[b]ased upon overcrowded conditions at certain grade levels, we will not be able to accept students in the affected grades with out-of-zone addresses for the school year of 1999-2000." Pls.' Ex. 5.[3] The letter provided forms for Brandon's enrollment in his zone school. No mention was made of whether the decision could be challenged and no names or numbers were provided for more information or to permit further discussion of the decision.

Swaggerty made many attempts to contact Llufrio immediately after receiving the letter to express her concern and to object to Brandon's transfer from FSK to TJ. She finally arranged to see him; she told him that she felt FSK was the appropriate placement for Brandon and it fully met his needs. She inquired about the reason for the transfer. Plaintiffs claim that after Swaggerty questioned the principal for a time, he finally replied that Brandon was transferred because, unlike several other out-of-zone students who were not being transferred from FSK, he had disabilities. In any event, Swaggerty filed a transfer application in an effort to readmit Brandon to FSK. That request was denied on July 30, 1999, by the Office of Student Placement. Pls.' Ex. 26.

As of August 1999, officials at TJ neither had funding for an aide for Brandon nor had

---

[3]Material in the administrative record will be cited in accordance with the labeling used in that proceeding. I will cite pages from the transcript of the hearing before the administrative law judge as Trans. at ___.

they made the necessary requests of school headquarters. On August 24, 1999, TJ's Principal notified Ken Jackson, Southern Area Special Education Coordinator, of the need for funding and other arrangements. No aide was present to assist Brandon until his fifth day of school at TJ. The aides were temporary contract employees from Maxim Healthcare Services and were not employees of BCPS.

The attendance of the aides was inconsistent: they arrived after school commenced and often left before school was dismissed. They apparently had received no training regarding Brandon's needs even though they were listed among the service providers implementing his IEP. The late arrivals and early departures were of particular concern because supervision of Brandon upon his entrance into the school in the morning and his egress at dismissal, when unrestrained physical contact with other children was likely, was noted to be of importance given Brandon's balance problems and the ease with which he is thrown off balance.

On September 28, 1999, an IEP meeting was held to address the poor attendance and inconsistency of the aides. At that meeting, among other things, an updated physical therapy evaluation performed on September 24, 1999, was discussed. The evaluation indicated that Brandon had balance deficits in all directions, was easily pushed off balance and thus needed constant supervision. After this meeting, there was no change in the poor attendance habits of the aides assigned to Brandon. Plaintiff alleges that Brandon did not receive appropriate supervision in that his aides were not always present, usually only one regular education

teacher was present in the classroom, and the teacher often had other students rather than an adult take Brandon from class to class and up the stairs.

Swaggerty wrote to Reginald Robinson, Interim Director of Special Education Administrative Services, complaining that TJ was failing to implement Brandon's IEP. Robinson informed plaintiff that the letter was being forwarded to the Southern Area Executive Office. In November and December 1999, Swaggerty wrote many letters to personnel in Baltimore City Special Education Administrative Services asking that the decision to transfer Brandon be reconsidered and to express concerns that Brandon's IEP was not being implemented at TJ. Pls.' Exs. 10-13. These officials did not respond to the letters, but they did seek and obtain verification of the aide attendance patterns submitted by the mother. Pls.' Ex. 17. On February 15, 2000, Kenneth Jackson, Area Special Education Coordinator, submitted a request to Robinson that a BCPS paraprofessional be assigned to TJ to address the inability of the Maxim Health to consistently provide personnel. Pls.' Ex. 18. A BCPS paraprofessional was never assigned.

By February 15, 2000, aides had been late 35 times and often departed at 2:25 p.m. rather than at 3:00 p.m. when students were dismissed. Aides had been entirely absent on 15 days by that date. Another IEP meeting was held on February 15, 2000. On February 17, 2000, Brandon was escorted by a fellow first grader to his locker and to the school exit. A group of boys bumped Brandon and he fell backwards and hit his head on the floor. Brandon woke up in a seizure on February 18, 2000, and was transported to Johns Hopkins Hospital.

Brandon's shunt had been broken in the encounter on February 17, 2000; surgery was required to remove the shunt and broken pieces and to insert a new shunt. A broken piece of the shunt still remains in Brandon's stomach. Brandon missed three weeks of school as a result of this injury and his recuperation from surgery.

An investigation was undertaken by the MSDE in response to a complaint filed by Swaggerty. Carol Ann Baglin, Assistant State Superintendent, Division of Special Education/Early Intervention Services, issued her report on March 16, 2000. *See* MSDE's Mot. to Dismiss, or For Summ. J., Ex. 2. The investigation included phone interviews with Swaggerty, a visit to TJ, interviews with TJ personnel, and a record review. Baglin found that at the September 28, 1999, IEP meeting "the services to be provided by the aide were expanded to include: meeting the student at the front door in the morning and escorting him out at the end of the day, helping him to ambulate throughout the school, assisting him at lunch time, and assisting him with fastening his clothes after going to the bathroom." *Id.* at p. 3. The MSDE further found that Brandon had not received all the speech therapy he was due according to his IEP. *Id.* at p. 4. It also stated that "*absent documentation that other staff provided the student with the services required by the IEP, this office is unable to determine whether the IEP was fully implemented regarding the provision of the services of an aide.*" *Id.* at p. 5 (emphasis added). MSDE concluded that it could not "determine whether BCPSS provided the student with the services of an aide in accordance with his IEP, pursuant to 34

C.F.R. § 300. Appendix A, Question 31."[4] MSDE required BCPS to convene an IEP meeting within 30 days, informed Swaggerty that she may submit more information for MSDE to consider, and that she may also file an administrative complaint. *Id.*

An IEP review was held on April 11, 2000. The meeting notes show that "the Team" believed that Brandon had received the speech services due him and that he was being appropriately supervised. Ex. 5. On July 24, 2000, plaintiffs requested a due process hearing, alleging that Brandon had been denied a free, appropriate public education ("FAPE") at TJ, and that his transfer to TJ from FSK amounted to a change in placement which occurred without the consent of the parent and without providing the specific notice required by law. A hearing was held before an ALJ on August 16, 2000. The ALJ's opinion in favor of BCPS issued on August 28, 2000. Plaintiffs timely appealed to this court.

B.    The IEPs

The central issues involved in this case concern whether the services agreed upon by the IEP team and enumerated in the IEP were implemented at TJ. The IEP created on January

---

[4]Question 31 asks: "Must the public agency ensure that all services specified in the child's IEP are provided?"

The Office of Special Education Programs responds: "Yes. The public agency must ensure that all services set forth in the IEP are provided, consistent with the child's needs as identified in the IEP. The agency must provide each of those services directly, through its own staff resources; indirectly, by contracting with another public or private agency; or through other arrangements. In providing the services, the agency may use whatever State, local, Federal, and private sources of support that are available for those purposes (see § 300.301(a)); but the services must be at no cost to the parent, and the public agency remains responsible for ensuring that the IEP services are provided in a manner that appropriately meets the student's needs as specified in the IEP. The SEA and responsible public agency may not allow the failure of another agency to provide service(s) described in the child's IEP to deny or delay the provision of FAPE to the child. (See § 300.142, Methods of ensuring services)." 34 C.F.R. Pt. 300, App. A, Notice of Interpretation, 66 Fed. Reg. 34766.

5, 1999, and reviewed on March 3, 1999, while Brandon was still at FSK, indicates that Brandon can write the numbers one to nineteen, but does not understand ordinal numbers, can write his name, but not other words, has needs in the fine motor, visual motor and visual perceptual area as well as a limited attention span and a "severe delay in receptive and expressive language skills." Pls.' Exs. 2-3. Among the goals outlined are "safe and independent mobility in school environment and optimal gross motor development." Pls.' Ex. 2, at p. 6.

The short-term objectives included: ascending and descending stairs with rail and alternating feet, standing up "with mature patterns," ambulating on balance beam with one hand held forward and one held sideways, and standing on one foot for five seconds. *Id.* Brandon's goals also included being able to maintain attention on activities for longer periods of time and master adaptive skills, such as washing hands independently and putting on and taking off his coat. Each week Brandon was to receive: one hour of speech therapy, forty-five minutes of occupational therapy, and forty-five minutes of physical therapy. *Id.* at p.10. He also was to receive five hours per week of special instruction in his regular education classroom. *Id.* at p.12. The IEP also states that the Brandon can engage in the following activities "with appropriate support," art, athletics, general school activities such as assemblies, meals, music, recess, and recreational activities. *Id.* at p.17.

The record indicates that an IEP meeting was held on March 3, 1999, to "address the need for a MRE (IEP aide)." Pls.' Ex. 3, at p. 2. The January 5, 1999, IEP was determined

to be appropriate, but it was noted that there was a need for *"a program aide to assist Brandon in performing all classroom activities each day he is in school (and/or had physical disabilities and needs assistance)." Id.* (Emphasis added). This meeting was also apparently held to review an Assessment completed by the school psychologist. Pls.' Ex. 4. The Assessment states that Brandon needs "additional adult supervision and assistance to be able to benefit from his school and classroom experiences as well as to physically negotiate the school environment." *Id.* at p.2. The school psychologist recommended that Brandon "receive additional assistance from an adult who is assigned specifically to him during his presence in the school building." *Id.*

An IEP meeting was held at TJ on September 28, 1999, in part, to address the inconsistent attendance of the aides assigned to Brandon. The record contains an unsigned memo, apparently from personnel of TJ, detailing the reasons for the IEP meeting. The reasons included: mother's concerns with the attendance of aides, confusion regarding the scope of services the aide is to provide and whether the aide's services are limited to the classroom, to clarify the services outlined in his IEP and their method of delivery, and to determine whether transfer back to FSK would be possible if TJ could not implement Brandon's IEP. Pls.' Ex. 7. The IEP minutes state that Brandon's gross motor skills are at the 3.5 year level, and that there are delays in fine motor and visual motor and perceptual skills. He was at a primer level in reading. Pls.' Ex. 8, at p. 2. It also states that he had difficulty at recess, in the bathroom and on the stairs. *Id.* It is also states that Brandon is very distractible

and needs direction to stay on task. *Id.* In the notes section of the IEP, it is stated that

> Mother's concerns included having an aide or teacher meet Brandon at the front door
> in the morning and escort him out at the end of the day, adult help coming up and
> down steps, help with washing hands and unfastening/fastening clothing if necessary,
> supervision at lunch time, recess, and help Brandon with inclusion in outside activities
> with other students at recess . . . all of these concerns were addressed and *will be
> implemented to the best of the staff's ability.*

Pls.' Ex. 8, at p. 3 (emphasis added).

A Progress Report completed by Brandon's physical therapist on September 24, 1999,

was also reviewed by the team. The report states that Brandon made progress in physical

therapy in the last school year, but that he continues to have balance deficits in all directions.

Pls.' Ex. 9. The report further states that Brandon still demonstrates an abnormal gait and can

run straight, and can turn a corner, "with moderate struggle . . . for about thirty feet on

carpet." *Id.* It is clearly documented that Brandon "can easily be pushed off balance and must

be supervised due to his balance deficits." *Id.*

An IEP meeting was held on February 5, 2000. This IEP includes the goal: "safe

independent mobility in the school environment on all surfaces with maximum gross

development at the 3-3.5 year level." Pls.' Ex. 20, at p. 6. To meet the physical therapy goals,

which included walking steps, standing on one foot for five seconds, climbing on the

playground equipment and playing on playground surfaces without assistance, and walking

easily backward, "supervision is needed on the stairs due to distractibility. Supervision

outdoors as many areas to be distracted [sic] can be encountered." *Id.* The hours of direct

special education services that he received were reduced from five to two hours. *Id.* at p. 11. It was also concluded that Brandon could participate in all extracurricular and non-academic activities "with adult supervision." *Id.* at p. 14. The IEP team notes state that "Parent had these concerns: 1) Brandon needs to be taken to class and dismissed at front door by an adult daily, 2) one on one supervision at lunch and recess, 3) one on one supervision in the bathroom and on steps, 4) one on one assistance at lockers, 5) one on one class room assistance to keep him on task. Team feels that this has been done *to the best of the staff's ability*. Mother disagrees. She wants a <u>one on one aide</u>, not a <u>program aide</u>." Pls.' Ex. 21, at p. 3 (underline in original)(italics added).

An IEP meeting was held on April 11, 2000. The IEP indicates that Brandon is at or near the first grade level for reading skills and reading comprehension, math calculation, math reasoning, written expression, and spelling. Ex. 5. It notes that Brandon has delays in motor functioning as well as perceptual functioning and language skills. *Id.* at p. 2. It also states that Brandon needs supervision when walking up steps. *Id.* In response to the issues surrounding the services of an aide for Brandon, the IEP indicates that "Team states that . . . . Brandon has been supervised by either a program aide and/or teachers. [The February] accident was not reported by Brandon or other students. Faculty is still supervising student *to the best of our ability*. It was stated by school members of the team that BCPSS has the authority to determine where IEP is implemented. IEP and supplementary aids are still considered appropriate." *Id.* at p. 4 (emphasis added).

-12-

C.    The Decision of the Administrative Law Judge

The hearing before an ALJ was held on August 16, 2000. The ALJ perceived the issue

to be "whether the assignment of the Child to a different school (from a nearby neighborhood

school to his home school) is a change in placement, thereby entitling the student to a due

process hearing on the question of provision of FAPE." ALJ Op. at 2. At the hearing,

testimony was given by: (1) Swaggerty; (2) Ingrid Welsh, Brandon's aide from FSK; (3)

Charles Bowmann, principal of TJ; and (4) Ellie Giles, Coordinator of Learning Center for

Montgomery County Public School, who was qualified as an expert witness in the field of

special education.

The ALJ found that "[d]uring the 1999-2000 school year, the Parent was present

nearly five days a week inside School # 84, and frequently found the Child engaging in

numerous academic and nonacademic functions, without the supervision of either an aide or

an adult." *Id*. at 9. She also found that Brandon was without an aide for approximately 30

days during the 1999-2000 school year and had a total of nineteen different aides. *Id*. at 7.

The ALJ noted that by mid-February 2000, BCPS acknowledged that up until that time

period aides had been late approximately 35 times, and often could not stay until the end of

the school day. *Id*. The ALJ also noted that when Brandon returned from school after his fall

and hospitalization on March 8, 2000, no aide was present. *Id*. at 8.

The ALJ found that Brandon "made academic progress on his IEP goals while

attending [TJ], despite the frequent absences of an aide in his classroom. He did make some

-13-

limited progress on his physical therapy goals, but a September 24, 1999 physical therapy progress review report noted that he could be easily pushed off balance and should be supervised due to his balance deficits." *Id.* at 7.

The ALJ stated that

[w]hen the IEP was revised on March 3, 1999, the team again considered the Parent's request for a program aide, and added such a requirement to the IEP, writing that, "a program aide was added to IEP to assist [the Child] in performing all classroom activities each day he is in school." The team made the change, in part, after considering the report of a school psychologist, written on February 10, 1999, in which the psychologist recommended that the Child "receive additional *assistance from an adult who is assigned specifically to him during his presence in the school building.*"

*Id.* (Emphasis added). The ALJ also noted that an IEP meeting was held on September 28, 1999. *Id.* The ALJ found that at that meeting *"[t]he team expanded the services to be provided by the aide to include meeting the Child at the front door in the morning, escorting him out at the end of the day, helping him ambulate throughout school. Assisting him at lunch time and assisting him with fastening his clothes after going to the bathroom."* *Id.* at 7 (emphasis added). The ALJ, however, concluded that

the team wrote that the Parent wanted an aide or teacher to meet the Child at the front door each morning and escort him out at the end of the day; an adult to help him up and down the steps and with hand washing and fastening of clothing, if necessary; an adult to supervise him at lunchtime; and an adult to help with outside activities with other students at recess. "All of these concerns were addressed and will be implemented to the best of the staff's ability," according to the IEP team minutes. The team did not, however, authorize the provision of a full-time aide. Nevertheless, the Parent signed the IEP.

*Id.* at 16.

-14-

The ALJ stated that "[t]here was no disagreement between the Parent and BCPS that the IEPs written during the 1999-2000 school year contained the appropriate programs and level of services for the Child." *Id.* at 10. The ALJ concluded that "there has been no showing of a genuine dispute as to a material fact concerning the IEP, program or services to be provided pursuant to the IEP." *Id.* at 11.

The ALJ concluded that "there was no evidence to support the Parent's contention that the IEP was not implemented at School #84 [TJ], only that it had been implemented in the manner requested by the Parent . . . . It was clear to the undersigned that had the staff made a good faith effort to provide either an aide or adult supervision to the Child throughout the school day, as they pledged to in the September 28, 1999, IEP notes, the February 17, 2000, accident would more likely not have occurred." *Id.* at 16. The ALJ reasoned that the "fact that the individual identified as a child's aide changed frequently or that the specific person was not always available to provide the services, is not in itself a violation." *Id.* at 14. The ALJ added that the school's methodology in implementing the IEP was discretionary. She stated that while there was some question whether school personnel had acted "to the best of their ability" in implementing aspects of the IEP, that issue was not of legal relevance as "this is a hearing to review the identification, evaluation or placement of the Child by BCPS." *Id.* at 16. Finally, the ALJ stated that "I have concluded that the law is clear, that a change in site location, without more, does not equal a change in educational placement and that the choice of the particular educational methodology employed is left to the school system." *Id.*

D.    The Statute

The procedural and substantive purposes of IDEA are well-settled. I have stated:

> The IDEA was drafted to "assure that all handicapped children have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs." The "centerpiece" of this "free appropriate public education" is the individualized education program ("IEP") which is a collaboratively developed plan for a disabled child's education. "The IEP is supposed to be the joint product of discussions among the child's parents, teachers, and local school officials and must specify goals and short-term objectives for the child, any related services, and the criteria and evaluation procedures that will be used." This written plan must be appropriately reviewed and revised.
>
> The IDEA mandates that all disabled children are entitled to a FAPE. The Supreme Court has not set forth a precise formula for determining what constitutes a FAPE. More generally, it has stated that the child must receive "access to specialized instruction and related services that are individually designed to provide educational benefit." Moreover, although a school system is not required to maximize a child's potential . . . it is imperative that the educational placement "be likely to produce progress, not regression or trivial educational advance."

*Cavanaugh v. Grasmick*, 75 F.Supp.2d 446, 456-57 (D.Md. 1999)(citations omitted).

Under the IDEA, the district court is required to conduct a *de novo* review of the administrative record while giving "due weight" to the administrative findings made below. *See Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir. 1991), *aff'd*, 39 F.3d 1176 (4th Cir. 1994). In reviewing IDEA cases, a court must not "substitute [its] own notions of sound educational policy for those of the school authorities." *Hartmann v. Loudoun County Bd. of Educ.*, 118 F.3d 996, 999 (4th Cir.1997), *cert. denied*, 522 U.S. 1046 (1998). Rather, as noted above, a federal district court must make a bounded independent decision based on the preponderance of the evidence, giving "due weight" to the state proceedings.

-16-

*See Doyle*, 953 F.2d at 103. If the administrative findings "were made in a regular manner and have evidentiary support," they are to be considered *prima facie* correct. *See id.* at 105. If the court chooses not to follow the administrative findings, it must explain its departure. *See Gerstmyer v. Howard County Pub. Sch.*, 850 F.Supp. 361, 364 (D. Md. 1994).

These principles and standards govern my review of the record here.

E.    Determination

1.    Claim Against MSDE

The Fourth Circuit has provided guidance concerning the state educational agency's responsibility under the IDEA. The Fourth Circuit has held that "the SEA [State Education Authority] is ultimately responsible for the provision of a free and appropriate public education to all of its students and may be held liable for the state's failure to assure compliance with the IDEA." *Gadsby v. Grasmick*, 109 F.3d 940, 953 (4th Cir. 1997). The statute provides that the SEA is responsible for assuring that policies and procedures are put in effect to implement the mandates of the statute. 20 U.S.C. § 1412(a). That is, the state must assure that "IDEA's substantive requirements are implemented." *Gadsby*, 109 F.3d at 952. If a local educational agency is unwilling or unable to provide services in compliance with IDEA, "the SEA is responsible for directly providing the services to disabled children in the area." *Id.* at 953.

If the court determines that there has been an IDEA violation, relative responsibility for the failure must be considered. *Id.* at 955. Thus, courts have not ruled out the possibility

that the SEA can in some cases be responsible for providing a FAPE, but require that the state's responsibility for the violation be shown before liability can be assessed. *Id.* I have previously concluded that, ordinarily, the SEA cannot be held liable for any errors committed by an ALJ. *See Fritschle v. Andes*, 25 F.Supp. 2d 699 (D.Md. 1998).

In the instant case, plaintiffs complained to the MSDE regarding Brandon's special education program. An investigation was completed by the MSDE and findings were issued by Carol Ann Baglin, Assistant State Superintendent Division of Special Education/Early Intervention Services, on March 16, 2000. The investigation was in depth. The findings regarding whether Brandon's IEP was implemented, however, were equivocal, at best, and downright disingenuous, at worst. It was determined that Brandon had not received the speech therapy services he was due and could not determine whether he had been provided with the services of an aide in accordance with his IEP. The MSDE ordered that an IEP meeting be held to address these issues, but had no further involvement in the case.

Plaintiffs do not allege that the State failed to create the proper procedures for determining placement or transfers. Rather, they allege that the MSDE became meaningfully involved in this case, by virtue of the complaint and investigation, and failed to take appropriate corrective action. *See* Pls.' Opp. to State's Mot. to Dismiss, at 3. They allege that the SEA was on notice of the mother's complaints as early was January 2000 and became involved through an extensive investigation, which involved site visits, record reviews, and interviews. Further, plaintiffs correctly contend that given the MSDE's conclusion regarding

the services provided to Brandon, the MSDE should have acted to insure that the failures it

identified were corrected or, at the very least, should have made a determination whether a

violation had occurred. Plaintiffs claim that, unlike reimbursement cases where plaintiffs

impute liability to the state after potentially costly action has been taken, the mother asked

the state to intervene early when corrective action could be taken with little disruption. *See*

Pls.' Opp. to State's Mot. to Dismiss, at 8.

In addition to insuring that BCPS implement the IDEA, the MSDE must establish

procedures so that parents' concerns can be addressed. The regulations require that:

> (a) . . . Each SEA shall include in its complaint procedures a time limit of 60 days
> after a complaint is filed under § 300.660(a) to--
>> (1) Carry out an independent on-site investigation, if the SEA determines that
>> an investigation is necessary;
>> (2) Give the complainant the opportunity to submit additional information,
>> either orally or in writing, about the allegations in the complaint;
>> (3) Review all relevant information and *make an independent determination
>> as to whether the public agency is violating a requirement of Part B of the Act
>> or of this part*; and
>> (4) Issue a written decision to the complainant that addresses each allegation
>> in the complaint and contains--
>>> (i) Findings of fact and conclusions; and
>>> (ii) The reasons for the SEA's final decision.
> (b) . . . The SEA's procedures described in paragraph (a) of this section also must--
>> (1) Permit an extension of the time limit under paragraph (a) of this section
>> only if exceptional circumstances exist with respect to a particular complaint; and
>> (2) Include procedures for effective implementation of the SEA's final
>> decision, if needed, including--
>>> (i) Technical assistance activities;
>>> (ii) Negotiations; and
>>> (iii) Corrective actions to achieve compliance.
> (c) Complaints filed under this section, and due process hearings under §§ 300.507

and 300.520-300.528 . . . .

34 C.F.R. § 300.661.[5] MSDE conducted an investigation and issued a report as required by

the regulations. Without any substantial justification for failing to make the determination

compelled by its findings, however, MSDE did not make a determination whether BCPS had

violated the Act. Rather, it simply concluded that it could not tell if any violations had

occurred.

I find that MSDE failed to fulfill its obligations when it reached such a non-conclusion

on the evidence before it. Moreover, neither allowing the parent to submit "further

information" for MSDE's consideration, nor notifying the parent of the availability of a due

process hearing, remedies the state's abandonment of its duty. It would be unfaithful to the

statutory scheme for a state education authority, having its own independent enforcement

role under the Act, routinely to coerce a parent into a costly and time-consuming adversarial

due process hearing against a local school system for the sake of expediency.

To the contrary, the regulations require that the MSDE insure compliance with the

Act: here, to conduct an investigation and (having ample basis for doing so) reach a

conclusion. It cannot, consonant with its obligations under the Act, merely conclude in the

face of substantial evidence of an on-going failure to implement an IEP by a local education

---

[5]The regulations also require that a complaint filed with the state that is also the subject of a due
process hearing must be set aside (and that the SEA will be bound by the decision reached at the
hearing.) *See* 34 C.F.R. 300.661(c). In this case, plaintiffs did not request a due process hearing until
after MSDE completed its investigation and issued its report.

authority that it cannot come to a conclusion, and thereby satisfy its duties under the Act. If the investigation did not yield sufficient information to reach a determination, then the MSDE had an obligation to continue its investigation until a proper determination could be made. Anything less makes the statutory and regulatory regime meaningless. If the evidence was contradictory, as MSDE contends, MSDE's Reply Mem. To Mot. for Summ. J., at 6, then its officials must address those contradictions and come to a resolution. It cannot merely throw up its bureaucratic hands and shift the burden to the complainant to resolve the contradictions.

Even if MSDE was not informed of Brandon's fall and resulting injury in February 2000, my finding in this issue remains the same. I conclude that MSDE failed in its responsibility to investigate and make a determination regarding the merits of the complaint. By failing to make a determination concerning whether Brandon was denied FAPE, MSDE cannot be heard to claim that, as a matter of law, it played no role in the denial of FAPE. Further, by failing to make a determination whether Brandon was denied FAPE, it cannot be said that MSDE did not fail in its statutory obligation pursuant to 20 U.S.C. § 1415 (a). Accordingly, MSDE will not be dismissed from this case.

2.    Claim against BCPS

Under state and federal law, the local education agency has an obligation to implement a student's IEP. The majority of IDEA case law addresses the appropriateness of an IEP rather than the failure of implementation. The Fifth Circuit, however, has briefly

addressed the issue of implementation. It has stated that:

> under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP. This approach affords local agencies some flexibility in implementing IEP's, but still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

*Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000).

The IEP of January 5, 1999, which was revised on March 3, 1999, added "a program aide to assist Brandon in performing all classroom activities each day he is in school (and/or had physical disabilities and needs assistance)." This sentence, at a minimum, requires the presence of an aide for all classroom activities, and at most requires the presence of an aide at times when his impairments are particularly prominent, such as those indicated in his IEP: ascending and descending stairs and standing up. The addition of the aide was also made in light of the school psychologist's recommendation that "additional assistance from an adult who is assigned specifically to [Brandon] *during his presence in the school building*," which would indicate that the aide's services were required beyond class room activities. Pls.' Ex. 4, at p.2. BCPS argues that "his IEP merely required BCPSS to provide 'appropriate support' in achieving his academic goals." BCPS' Mem. in Support of Ans., at 5. The IEP allowed "appropriate support" to be the adequate level of services only in extra curricular activities such as art and music as is clearly indicated in the section cited by BCPS, "Participation in Nonacademic and Extracurricular Activities and Services."*See* Pls.' Exs. 2, 3, 8, 20, Ex. 5.

-22-

The IEP is clear that an aide was to be provided during all classroom activities. The record shows that TJ was not able to provide Brandon with an aide consistently and acknowledged this inability as early as February 2000, when the Area Special Education Coordinator requested that a BCPS paraprofessional be assigned to TJ to address this need. The inclusion in the IEP of the provision of an aide for all classroom activities is a significant element of Brandon's educational program as the aide provides assistance for all class room activities and makes it possible for him to be maintained in the general education setting.

It is hard to see how such services could be anything but substantial and material. The aide is listed as a service provider, along with the special and regular educator in all of Brandon's IEP goals. Further, Part V of each IEP, "Determination of Placement," indicates that the IEP cannot be implemented without "supplementary aides and services" for Brandon to be maintained in a regular education setting. Just as the court must respect the expertise of educators in determining best practices for educating children with special needs, the court must hold the school to its word: if it has determined that an aide is necessary to provide FAPE, an aide must be provided. If the school believes some lesser assistance, such as merely adult or peer supervision is appropriate, such services should be outlined in the IEP.

The record does not support the ALJ's conclusion that "there was no evidence to support the Parent's contention that the IEP was not implemented at School #84, only that it had been implemented in the manner requested by the Parent . . . ." ALJ Op. at 16. Further, the ALJ's contradictory findings do not support this conclusion. In sum, the record supports

-23-

the conclusion that a significant element of Brandon's IEP was not implemented by TJ.

The ALJ found that: (1) there was no aide present when Brandon began the school year at TJ; (2) aides were absent for at least thirty days during the school year; (3) aides were late at least thirty-five times during the school year; and (4) the parent visited the school almost every day and frequently found Brandon without supervision of an adult or aide during academic and non-academic activities. These findings reflect the ALJ's acknowledgment that an aide was not provided consistent with the IEP for a significant portion of the school year.

BCPS argues that it attempted to implement Brandon's IEP "to the best of its ability." It is true that IDEA regulations mention "good faith," but BCPS misreads the regulations on this issue. The regulations require as follows, in pertinent part:

> (a) Provision of services. Subject to paragraph (b) of this section, each public agency must--(1) *Provide special education and related services* to a child with a disability *in accordance with the child's IEP*; and (2) Make a *good faith effort* to assist the child to achieve the *goals and objectives* or benchmarks listed in the IEP.

34 C.F.R. § 300.350 (emphases added). The regulations mandate that services are provided in accordance with the IEP and that a "good faith effort" be made to help the child meet his IEP *objectives*. The regulations plainly show that these are two separate requirements that cannot be merged and encompassed by a "good faith effort" standard. It is understandable why these requirements are distinct and carry with them qualitatively different standards. Even the best educator with all the services available cannot guarantee that a child will meet all objectives set out in an IEP. The "good faith effort" standard in this context would seem

to reflect the belief that an educator who tries his or her best to help the child reach her goals should not be penalized if all objectives are not reached.

Such is not the case in the context of services that are required by the IEP. The statute instructs that the IEP should include "a statement of the special education and related services and supplementary aids and services to be provided to the child." 20 U.S.C. § 1414 (d)(1)(A)(iii). Provision of those services is within the control of and is the obligation of the school and BCPS as they have agreed that the services listed in the IEP are the ones required by the child to receive a FAPE. A "good faith effort" will not meet the statutory and regulatory commands.

The provision of an aide, for example, was determined by the IEP team to be a service to be provided to Brandon and thus was included in his IEP. Providing an aide in accordance with the IEP is mandatory, not discretionary. In contrast, one of Brandon's IEP objectives was to "ascend and descend steps with rail and alternating feet." School staff must make their best efforts to help him meet this goal, but may satisfy the statute when they can demonstrate that they made their best efforts to meet this objective. The regulation does not allow compliance to be achieved when "a good faith effort" is made to implement the IEP. BCPS contends that the regulation and statute can be satisfied when the school "me[ets] its good faith requirement in implementing Brandon's IEP to the best of it ability." BCPS' Mem.in Support of Ans., at 5. This contention is unavailing. Further, while the school may have discretion in determining the mode of implementation of the IEP and even the site of

the implementation, it is limited by what the IEP actually lists as agreed upon services and

is bounded by the mandate that those services be provided, not that "best efforts" be made

to provide those services. That TJ made its "best efforts" to implement Brandon's IEP,

reporting that it was "challenging" to maintain "punctual" and "consistent" aides, BCPS

Mem. in Support of Ans., at 5, does not satisfy its duty under the statute. Furthermore, the

Notice of Interpretation to the Federal Regulations states that

> The public agency must ensure that all services set forth in the child's IEP are
> provided, consistent with the child's needs as identified in the IEP. . .The SEA and
> responsible public agency may not allow failure of another agency to provide
> service(s) described in the child's IEP to deny or delay the provision of FAPE to the
> child.

34 C.F.R. Pt. 300, App. A, Question 31, 66 Fed. Reg. 34766.

The IEP meeting held at TJ in September 1999 stated that the mother's concerns that

an aide work with Brandon for such activities as entrance to school and dismissal, going up

and down stairs, recess, and lunch time, "will be implemented to the best of the staff's

ability." The ALJ apparently accepted BCPS's claim that even if an aide was not provided,

Brandon had adequate adult supervision from his teachers or other adults and that they had

met their obligation "to the best of their ability." Regardless of whether the IEP called for

an aide for all activities throughout the school day or just in classroom activities, the IEP

requirement of an aide for Brandon has no meaning if it is satisfied by the presence of a

teacher assigned to that classroom. BCPS argues that other adults were in the room when the

aide was not, but this is not supported by any evidence in the record other than assertions that

a student-teacher trainee from Towson University, parent volunteers or other service providers may have been present at different points during the school year. Trans. at 185-86.

In many IDEA cases, to determine whether a school board has complied with the provisions of the IDEA, a court must follow the two step inquiry set forth in *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). First, the court must determine if "the State complied with the procedures set forth in the Act." *Id.* Second, the court must evaluate whether "the individualized educational program developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits." *Id.* at 207. I also must consider not only of a violation of the IDEA has occurred, but whether it has resulted in a loss of educational opportunity or whether the violation is merely technical. *See Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir. 1990). I have found a substantive violation of the IDEA in TJ's failure to implement Brandon's IEP. While the ALJ did not find a violation of the IDEA, she did find that Brandon had made educational progress. ALJ Op. at 7.

The degree of progress that Brandon made at TJ is not clear from the record.[6] Moreover, it is not clear to me that a demonstration of some educational progress would

---

[6]The IEPs show that Brandon improved in his ability to write letters and numbers between September 1999 and April 2000. *See* Pls.'Ex. 9, Pls.' Ex. 20, Ex. 5. Little progress was made in gross and fine motor skills as they appear to have remained at the 3.5 years of age level throughout his time at TJ. *Id.* While the record is not clear in this issue, it does not show nor does the ALJ elaborate an educational program "likely to produce progress, not regression or trivial educational advance." *Hall v. Vance County Board of Education*, 774 F.2d 629, 636 (4th Cir. 1985).

negate the IDEA violation resulting from the failure to implement Brandon's IEP. The Fourth Circuit has held that "failures to meet the Act's procedural requirements are adequate grounds by themselves" for finding a denial of FAPE, apparently without an inquiry into whether educational benefit was conferred on the student despite of the procedural violation. *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir. 1985). Such a holding would seem to reflect a belief that the IDEA serves a deterrent function and creates substantive rights that can be enforced even if a child has been lucky enough to make progress despite a school's failure to comply with federal law. In other words, when it is clear that the statute has been violated, a school should not be released from liability because a child has made some minimal educational progress.

In any event, the likelihood of educational harm is clear if the court takes seriously the simple fact that the commitment of services outlined in the IEP resulted from a comprehensive analysis of Brandon's needs, and if the court takes seriously Congress's intent, as evinced through the IDEA statutory scheme, that supplemental and related services that assist a child in educational achievement be provided in the same fashion as other direct educational services. As discussed above, IDEA, and before it the Education of Handicapped Children Act, created for children a right to a free and appropriate public education. For disabled children, making this right a reality frequently includes simply the provision of supplemental services, assistive technology, and other modifications that would allow children to be educated in a public school environment without a drastic modification in the

-28-

program itself and without excluding the child from contact with non-disabled children. These supplementary and assistive services make the achievement of educational and non-educational goals possible, as they allow a child to be placed in the position to receive the same benefit as a non-disabled child. As the school psychologist noted, the provision of an aide allows Brandon to "slowly master activities and participate in events that he might otherwise be unable to access" and encounter and navigate the school environment in ways not possible without such assistance. Pls.' Ex. 4.

Thus, that Brandon may have made some educational progress despite the significant lapses in TJ's implementation of his IEP cannot be used as shield to deny him the baseline opportunity to benefit from his educational program in the ways deemed appropriate by his IEP. An aide reinforced skills Brandon sought to master in his IEP and also provided him with the assistance and support so that he could move about the school building with his peers and participate in school activities and recreation. Thus, having an aide allows Brandon to remain in the least restrictive environment possible. This is one of the goals of the IDEA.

I hasten to add that I do not doubt that schools must be allowed the discretion to implement IEPs in a variety of ways when appropriate. For example, if an IEP objective was stated to be the identification of all letters in the alphabet, the school could choose the most effective method to achieve that objective as long as such method did not conflict with what is required by the IEP. The school, however, does not have the discretion to decline to implement the services listed in the IEP or decide unilaterally, without initiating an IEP

-29-

meeting to institute a change, that a service listed in the IEP need not be provided. The OSEP

has stated that "[o]nce an IEP is developed and finalized, it must be implemented as written

. . . ." *Letter to Kerr*, 31 IDELR 81 (Nov. 23, 1997). An IEP, after all, is the result of a

deliberative and collaborative process between the school staff and parents. Congress went

to great lengths to make this so. The services agreed upon are written into the IEP both to

provide clarity for the service provider and to provide clarity to the parent so that there will

not be a question as to what the child is due. It is plain that "the substance of educational

programs, policies and methods" are to be left to school officials and that it is not the court's

role to intrude on this policymaking and management role. *Barnett v. Fairfax County Sch.

Bd.*, 927 F.2d 146, 152 (4th Cir. 1991). However, once the school outlines the substance and

the details of a child's educational program and the services deemed necessary to provide

FAPE, the court does not intrude on the school system's domain when it demands that the

services outlined in the IEP be provided. While Brandon is not entitled to a particular aide,

the services of an aide must be provided in accordance with his IEP.

For all these reasons, giving due deference to the ALJ's findings and determinations,

I find that the ALJ erred; the only rational determination supported by substantial evidence

in this record is that defendants have failed to implement Brandon's IEP. To find, as did the

ALJ, that a school and school system can satisfy IDEA by merely making "best efforts" to

implement an IEP and that, despite those efforts, Brandon was not provided with an aide for

at least 30 full school days and he suffered the lack of an aide for ingress and egress on

account of the assigned aide's late arrival or early departure on at least 35 days, would set a dangerous precedent. It would make the agreement reached by the IEP team and the commitment of services agreed upon and spelled out in the IEP mean little in terms of a guarantee of services for children with special needs. This record compels the conclusion that Brandon's IEP was not fully implemented for what totals at least one third of a 180-day school year. Given this record, I cannot endorse the ALJ's determination that Brandon was not denied FAPE.

Plaintiffs also contend that Brandon's transfer from FSK to TJ was a change in placement in that his program was materially altered by TJ's failure to adequately implement his IEP. Plaintiffs allege that they were not given the appropriate notice or due process protections in relation to this change in placement, preventing them from taking advantage of the Act's "stay put" provision.[7] The ALJ concluded that the change in Brandon's school assignment did not constitute a change in educational placement. In view of my determination above, I need not adjudicate the issue of whether Brandon's transfer constituted an improper change in placement.

_____

[7] A parent is entitled to written notice when a change or refusal to change "an educational placement." 20 U.S.C. § 1415 (b)(1)(C) and an opportunity to present complaints relating to that placement decision. (b)(1)(E). The parent is then entitled to a due process hearing on this complaint. 20 U.S.C. § 1415 (f)(1). A party aggrieved by the administrative findings or determinations can bring suit in federal court. According to the statute, during the pendency of any proceeding conducted pursuant to this section, unless an agreement is reached to the contrary, "the child shall remain in the then-current educational placement of such child . . ." 20 U.S.C. § 1415 (j); *see also* COMAR 13A.05.01.14K.

III.    Remedial Action

IDEA directs the court to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(e)(2). The Supreme Court has interpreted this language to "confer[] broad discretion on the court" and that "[a]bsent other reference, the only possible interpretation is that the relief is to be 'appropriate' in light of the Act." *School Committee of the Town of Burlington, Massachusetts v. Dept. of Educ. of the Commonwealth of Massachusetts*, 471 U.S. 359, 369 (1985). Brandon shall be re-enrolled in FSK and his IEP shall be implemented appropriately. I understand that there is no guarantee that FSK can flawlessly implement Brandon's IEP or that his prior aide will be available to provide assistance. The statute, in fact, does not require this. It is clear, however, that despite many months of effort, TJ was not able to implement Brandon's IEP and will not likely be able to do so in the foreseeable future.[8] Thus, appropriate relief in this case consists of returning Brandon to FSK. An Order follows.

Filed: August 14, 2001

ANDRE M. DAVIS
United States District Judge

---

[8]Plaintiffs have recently asked that Swaggerty be reimbursed for the costs associated with home schooling. Pls.' Opp. to BCPS's Mem. in Support of Ans, at 2. This issue was not raised in previous motions or at the hearing and has not been fully addressed by either party.